**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**-------------------------------------------------------X**
**JOHN DOE,**

                    **Plaintiff,**

      **-against-**

**SARAH LAWRENCE COLLEGE,**

                  **Defendant.**
**-------------------------------------------------------X**

**Civil Action No:**

**COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his complaint against Defendant Sarah Lawrence College ("Sarah Lawrence" or the "College"), respectfully alleges as follows:

## <u>THE NATURE OF THE ACTION</u>

1.     This action arises out of the egregious, biased, intentional, and discriminatory actions taken by Sarah Lawrence against Plaintiff throughout the College's Title IX sexual misconduct process, which ignored the specific facts of the case and rushed to find Plaintiff responsible as a male accused.

2.     Sarah Lawrence engaged in a sloppy and flawed investigation that was plagued by procedural inadequacies that breached the College's own written procedures, disregarded Plaintiff's disability accommodations, kept Plaintiff in the dark throughout the process, prevented Plaintiff from having a meaningful opportunity to be heard, and even prevented Plaintiff from presenting exculpatory evidence.

3.     Fellow student Jane Roe[2] brought forth false allegations of sexual assault against

---

[1] Plaintiff has filed a motion herewith to proceed by pseudonym.
[2] Jane Roe is a pseudonym.

Plaintiff following a consensual, months-long relationship that they shared, in retaliation against Plaintiff after he ended the relationship.

4.     Indeed, Roe admitted during the investigation that it was not the acts that occurred on the dates of the alleged incidents that caused Roe to bring forth the complaints, but rather Plaintiff's actions *afterward* (i.e., Plaintiff breaking up with Roe and terminating contact).

5.     After Plaintiff ended the relationship, Roe stood outside Plaintiff's dorm building trying to get Plaintiff to talk to her and sent Plaintiff long emails stating that she still liked him.

6.     Yet, after about three weeks passed with no contact, Roe, on information and belief, grew angry at Plaintiff for breaking off the relationship and decided to bring a Title IX complaint against Plaintiff to get even with him.

7.     Despite a clear motive for bringing the false allegations and documented behaviors that called Roe's credibility into question, the College not only investigated Plaintiff to the fullest possible extent, but engaged in underhanded techniques, such as feeding female witnesses leading questions, in order to paint a narrative in which Plaintiff, the male accused, would be found responsible.

8.     As a result of the College's biased and flawed proceedings, Plaintiff was found responsible for nonconsensual sexual intercourse, and was sanctioned to suspension from the College for one year.

9.     By employing a gender-based presumption of Plaintiff's guilt, and by imposing an unreasonable sanction, Defendant displayed anti-male discriminatory bias in violation of Title IX of the Education Amendments of 1972.

10.     By violating its own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendant breached express and implied agreements with Plaintiff and acted

in bad faith in failing to fulfill its promises to him as an enrolled student paying tuition to Sarah Lawrence.

11.    By refusing to provide Plaintiff with accommodations at the hearing in accordance with his College disability accommodations, Defendant violated the Americans with Disabilities Act (ADA).

12.    Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

13.    Plaintiff is a natural person and a resident of the state of Washington. During the events described herein, Plaintiff was enrolled as a fulltime, tuition-paying, undergraduate student at Sarah Lawrence. Plaintiff matriculated to Sarah Lawrence in August 2020 with an expected graduation of May 2024.

14.    Defendant Sarah Lawrence is a partially federally-funded private university located in Bronxville, New York, where it maintains its principal offices and place of business.

## JURISDICTION AND VENUE

15.    This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Defendant is a citizen of the state of New York, and at the time of the events described herein Plaintiff was a citizen of the state of Washington; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

16.    This Court has personal jurisdiction over Defendant Sarah Lawrence on the ground that it is conducting business within the State of New York.

17.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391

because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

I.    **BACKGROUND**

    A.    **The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints**

18.    On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

19.    The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

20.    The OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof — "more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof. (DCL at 10-11).

21.    Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

22.    On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies

and advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf OCR's April 2014 at 31.

23.     In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. *Id.* at 25-31.

24.     In the same month that the OCR issued its April 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

25.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/.

26.     Colleges and universities, including Sarah Lawrence, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like Sarah Lawrence, have limited procedural protections afforded to males, like the Plaintiff, in sexual misconduct cases.

**B.      The 2017 Revocation of the DCL**

27.     On September 22, 2017, the OCR formally rescinded the DCL and the April 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

28.     In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

29.     The 2017 Q&A suggests that the policies and procedures in place at Sarah Lawrence at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

30.     On information and belief, despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, Sarah Lawrence did not change its Title IX procedures.

**C.      The 2020 Title IX Final Rule**

31.     On May 6, 2020, the Department of Education released new Title IX regulations, which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "2020 Title IX Final Rule") which carried the force and effect of law as of August 14, 2020. ("US Department of Education     Releases     Final     Title     IX     Rule,"     available     at https://www2.ed.gov/about/offices/list/ocr/newsroom.html).

32.     The 2020 Title IX Final Rule replaced all previously issued OCR guidance, including the rescinded 2001 Title IX Revised Sexual Harassment Guidance.

33.     The 2020 Title IX Final Rule provides respondents with procedural rights, including the right to a live hearing with cross-examination of all witnesses. (*See* "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).

34.     In light of the 2020 Title IX Final Rule, Sarah Lawrence updated its Title IX Policy as of August 14, 2020.

**D.     Sarah Lawrence Faces Years of Complaints for Failing to Adequately Address Claims of Sexual Misconduct Allegedly Committed by Male Students and/or Faculty**

35.     For years, Sarah Lawrence has faced student pressure regarding its failure to adequately address sexual misconduct complaints and to keep students informed of the Title IX process.

36.     For example, students have been protesting the College's handling of sexual assault cases dating back to 2016, when the Sarah Lawrence It's On Us chapter organized a rally on the College's campus. *See Students Protest College's Handling of Sexual Assault*, The Phoenix (Nov. 12, 2016), available at http://www.sarahlawrencephoenix.com/campus/2016/11/12/students-

protest-colleges-handling-of-sexual-assault.

37.     The students gathered, listing demands such as "policy changes such as accountability of the administration for violation of laws surrounding sexual assault response and Title IX training, [and] calls for cultural changes such as a greater focus on the safety of students and not on the image of the college." *Id.*

38.     Students also urged the College to "be gentler with survivors and more supportive, instead of re-victimizing and making it like somehow the survivor is at fault, or making somebody tell their story over and over, or write it down, or tell people they're not comfortable telling. It's hard enough to go through it, it's even harder to have to tell it once, it's too much to ask someone to do that more than once." *Id.*

39.     In 2020, women from Sarah Lawrence outed a rising comedy star, James Veitch, for sexual assault. According to the women, Veitch was known for being a "creep" on Sarah Lawrence's campus, yet the College did nothing to stop him. *See* Carmen MacBeth, *Rising comedy star James Veitch: Is he also a serial predator?* Film Daily (Sept. 1, 2020), available at https://filmdaily.co/news/james-veitch-sexual-assault/.

40.     Sarah Lawrence continued to be no stranger to headline news regarding sex abuse scandals, as was evident in the case against one student's father who was convicted for extortion, racketeering conspiracy, and sex trafficking students at the College. *See* Peter D. Kramer, *Sarah Lawrence sex and extortion: Inside the federal case against Lawrence Ray*, Lohud (Feb. 12, 2020), available at https://www.lohud.com/story/news/local/westchester/yonkers/2020/02/12/sarah-lawrence-sex-extortion-details/4740643002/.

41.     The sex trafficking scandal dated back to 2011, when the student's father invited six vulnerable college students to live with him in Manhattan rent free. While living together, he

held himself out to be helping the students with their careers and sharing his intelligence and guidance. Meanwhile he groomed the students, forcing them to engage in group sex, and made threats against them that made the students fearful to leave. He even forced the students into prostitution and pocketed nearly $2 million from it. *See* Eric Spitznagel, *'I went to Sarah Lawrence and unwittingly joined a dangerous sex cult'*, NY Post (Sept. 25, 2021); *see also* Mary Dela Cruz, *Sarah Lawrence 'Sex Cult' Leader Forced Follower Into Prostitution to Pocket $2 Million*, Latin Times (Oct. 19, 2021).

42.     The students finally came forward in 2019 and spoke to reporters at New York Magazine, and the article sparked a federal investigation. He was arrested in February 2020, nearly 10 years after the scandal first began. *See* Spitznagel.

43.     Since the scandal broke, Sarah Lawrence has been at the forefront of the media due to the cult leader who lived on Sarah Lawrence campus amongst their students. In response, the President of Sarah Lawrence, Cristle Collins Judd, stated that the College is in a "different place" now, and that "she's working with others at the college to make sure the mantra 'say something' when they 'see something' is more deeply rooted." *See* Tiffany Cusaac-Smith, *Sarah Lawrence's president responds to sex trafficking, extortion case*, Lohud (Feb. 13, 2020).

44.     Following a highly publicized trial, on April 6, 2022, the man at the forefront of the Sarah Lawrence scandal was found guilty by a jury on all 15 federal counts including sex trafficking, extortion, and racketeering. *See* Colin Moynihan, *Sarah Lawrence Cult Leader Convicted of Trafficking and Extortion,* The New York Times (April 6, 2022) https://www.nytimes.com/2022/04/06/nyregion/sarah-lawrence-cult-lawrence-ray-trial.html

45.     On information and belief, given the recent headline-making scandals brought forth by women on campus against men, Sarah Lawrence has taken a hardline approach on males

accused of sexual misconduct in order to prove that the College takes sexual misconduct matters seriously.

## II.   SARAH LAWRENCE INVESTIGATES PLAINTIFF BASED ON ROE'S UNFOUNDED ALLEGATIONS

### A.   Plaintiff and Roe

46.   Plaintiff and Roe first met during the Fall of 2020, when they were both enrolled in a performing arts class at Sarah Lawrence.

47.   At the time, classes were held remotely due to the COVID-19 pandemic.

48.   Plaintiff was living on campus, and Roe was living off campus.

49.   Plaintiff and Roe became friends after they were assigned to work on a project together in their class.

50.   Plaintiff and Roe frequently met via Zoom and spent time working on the project and getting to know each other.

51.   Plaintiff and Roe quickly became friends, and developed a mutual attraction for each other.

52.   Plaintiff and Roe continued to communicate via Zoom, social media messages, and on the phone throughout the semester.

53.   Roe moved on campus at the beginning of the Spring 2021 semester, on or around January 31, 2021.

54.   Roe went to Plaintiff's dorm the day she moved in, and spent the first several nights there.

55.   At the time, Roe communicated that she did not want to have intercourse because Plaintiff was engaged to be married and because Roe had a medical condition for which she needed external lubrication in order to have sexual intercourse.

56.     However, Roe was eager to engage in other sexual activity, including kissing and touching.

57.     Plaintiff and Roe engaged in consensual sexual activity, including kissing and touching, the first few nights, but did not engage in sexual intercourse.

**B.      The Alleged Incident of February 4, 2021**

58.     On the night of February 4, 2021, Plaintiff and Roe engaged in consensual sexual kissing and touching, as they had on prior nights.

59.     At one point, Roe was positioned on her hands and knees on Plaintiff's bed facing away from Plaintiff, and Plaintiff was behind Roe with his genitals pressed against Roe's lower back just above the cleft of Roe's buttocks.

60.     Plaintiff and Roe grinded against each other and after a few minutes, as a result of both parties' movements, Plaintiff's penis slipped and accidentally, briefly penetrated Roe's vagina.

61.     Both Plaintiff and Roe immediately pulled away, as neither party intended to engage in sexual intercourse.

62.     Roe began to bleed, and Plaintiff helped Roe clean up.

63.     Plaintiff immediately apologized to Roe and both agreed they never intended for penetration to occur.

64.     Plaintiff loaned Roe a pair of his pants, and Plaintiff walked Roe to her on-campus residence hall.

65.     Roe never indicated that she viewed the incident as assault, but rather agreed with Plaintiff that it was a mutual accident by both parties.

66.     After going back to Roe's residence hall, Roe changed, and Plaintiff and Roe

attended a party together on campus.

67.     Roe made no mention of being uncomfortable with Plaintiff, but acted friendly and normal with Plaintiff.

68.     Plaintiff and Roe spoke again two days later, on February 6, 2021, when Plaintiff texted Roe about COVID-19 restrictions on campus.

69.     Roe not only responded as normal to Plaintiff's message, but even proposed that the two hang out again.

70.     Indeed, Roe texted Plaintiff just days after the alleged February 4, 2021 incident stating, "I don't know how well I'll be able to sleep tonight without anyone inside me," and that she missed Plaintiff.

71.     In the following days, Roe invited Plaintiff to go to the mall for the purpose of purchasing sexual lubricant so that she and Plaintiff could have sexual intercourse.

72.     Plaintiff and Roe continued to have consensual sexual encounters, including sexual intercourse, approximately 20 times according to Roe from February 4, 2021, to the end of March 2021.

73.     In the middle of March 2021, Roe also decided, on her own, to go on birth control and proposed to Plaintiff having sexual intercourse without a condom because she "wanted it to feel more real."

**C.     The Alleged Incident of March 23, 2021**

74.     On March 23, 2021, Roe was accepted to study abroad for the Fall 2021 semester, and told Plaintiff that she wanted to celebrate with him.

75.     When Roe got to Plaintiff's dorm that night, Plaintiff and Roe went to the liquor

store for Roe to purchase liquor.[3]

76.      Roe purchased a bottle of scotch, and then they went back to Plaintiff's dorm room to drink.

77.      Plaintiff and Roe both drank scotch, and Roe became intoxicated.

78.      While laying on top of Plaintiff, Roe told Plaintiff that she loved him.

79.      Plaintiff was extremely uncomfortable with Roe's statement, given that Roe knew that Plaintiff was engaged.

80.      Plaintiff listened to Roe with an expressionless face, which on information and belief, angered Roe, who got up and went to the restroom.

81.      When Roe returned, Plaintiff faked receiving a phone call, and claimed that he needed to be alone, as his grandmother was in the hospital, because he was uncomfortable with Roe's affection and wanted her to leave.

82.      Roe left shortly thereafter, exhibiting no signs of incapacitation – she was not tripping, stumbling, or otherwise demonstrating that she was incapacitated.

83.      On her way out, Roe was visibly upset at Plaintiff's lack of emotions after she told Plaintiff she loved him.

84.      Roe screamed in the dorm parking lot, kicked the drainpipe, and sent a piece of the drainpipe flying.

85.      Afterward, Roe continued to text Plaintiff, seeking to hang out again.

86.      On March 31, referring to a word recently used by a friend, Roe texted to Plaintiff, "speaking of seduce, do you want to hang out tonight?"

87.      Plaintiff did not reply to Roe's text.

---

[3] At the time, Roe was 21 and legally able to purchase alcohol. Plaintiff was 19.

88.   Roe continued to text Plaintiff in a panic asking what was wrong because Plaintiff was not answering.

89.   On April 3, 2021, Plaintiff texted Roe informing her that his engagement ring was not in his room and asking Roe if she took it.

90.   Roe *went to Plaintiff's dorm building* wearing nothing but a long trench coat and cried for Plaintiff outside the building in an attempt to get Plaintiff to speak to her. However, Plaintiff did not go outside.

91.   When Roe could not get inside Plaintiff's dorm, she called her dorm Resident Adviser in a panic, misleading her Resident Adviser to believe that Roe was in serious distress, and triggering a false alarm campus security response due to Roe's dramatics.

92.   On April 4, 2021, Plaintiff texted Roe saying that they should talk, and they met in person that same night.

93.   When they met, Plaintiff informed Roe that on the night of March 23, 2021, Roe had kicked the drainpipe and that Campus Security was called about the incident.

94.   Roe claimed she did not remember the event happening, and apologized.

95.   Plaintiff then ended his relationship with Roe in that same conversation.

96.   On April 5, 2021, Roe emailed Plaintiff an approximately nine-paragraph email in which she admitted that she still liked Plaintiff and was even falling in love with him.

97.   Roe's email also went on to say that she was upset because Plaintiff had "falsely accused" Roe of kicking the drainpipe.

98.   Roe's April 5, 2021, email never mentioned an alleged March 23, 2021 "sexual assault" which she later claimed took place just two weeks prior to this email.

99.   Plaintiff did not reply to Roe's email.

14

100.    Plaintiff and Roe had no further contact after Roe's April 5, 2021, email.

**D.    Roe Retaliates Against Plaintiff for Ending Their Relationship**

101.    On April 20, 2021, about two weeks after Roe's email *in which she admitted she still liked Plaintiff* and was hurt by Plaintiff's lack of reciprocation, Roe filed a complaint against Plaintiff with the College's Title IX office.

102.    On information and belief, Roe was embarrassed and hurt when Plaintiff did not reciprocate her feelings, and also felt scorned that Plaintiff had "falsely accused" her of breaking the drainpipe, and filed false allegations against Plaintiff in an effort to "get even."

103.    Additionally, what Roe did not tell Plaintiff was that at the same time she was seeing Plaintiff, she was writing a play about sexual manipulation. On information and belief, Roe's play also prompted her to bring false allegations.

104.    In Roe's filed complaint, she claimed that Plaintiff sexually assaulted her on the night of March 23, 2021, by engaging in sexual intercourse without consent, despite Plaintiff and Roe not having engaged in sexual intercourse that night.

105.    On May 3, 2021, Daniel Trujillo ("Trujillo"), the College's Title IX Coordinator, issued a Notice of Investigation to both Plaintiff and Roe, as well as a mutual no-contact order.

106.    The Notice of Investigation stated that Plaintiff was under investigation for sexual assault involving sexual intercourse without consent on March 23, 2021.

107.    The Notice of Investigation assigned Joseph Vincent ("Vincent") and Alexandria Torres ("Torres") as Investigators for Plaintiff's case.

108.    Notably, after issuing the Notice of Investigation, Trujillo spoke with Plaintiff, and told Plaintiff that he did not believe that the complaint would "go anywhere," leading Plaintiff to believe that he did not have anything to worry about.

109.    On May 8, however, Roe went back to the Title IX office and added a complaint against Plaintiff for an incident that allegedly occurred *prior* to March 23, 2021.

110.    Roe's new complaint claimed that the sexual encounter that occurred on February 4, 2021 constituted sexual assault, despite the fact that both she and Plaintiff had talked about the event and agreed that it was a mutual mistake made by *both* parties, and continued to engage in a consensual sexual relationship after the alleged incident that included sexual intercourse approximately 20 or more times.

111.    On May 17, 2021, Trujillo issued a revised Notice of Investigation to Plaintiff and Roe.

112.    The revised Notice of Investigation that was sent to Plaintiff charged Plaintiff with sexual violence arising from events on the night of February 4, 2021, *but did not contain any information as to the nature of the alleged sexual violence*.

113.    Given that Roe had previously alleged sexual acts that had not occurred in her first complaint regarding a claimed March 23, 2021 incident, Plaintiff had no way of knowing what exactly Roe was alleging to have occurred on February 4, 2021.

114.    The revised Notice of Investigation that was sent to Roe, however, fully described the allegations as "conduct involving sexual intercourse without consent on the evening of February 4, 2021."

115.    The revised Notice of Investigation sent to Plaintiff effectively kept Plaintiff in the dark as to the allegations, while the detailed notice sent to Roe ensured that Roe was fully informed of the proceedings.

116.    The Notice of Investigation also did not fully and fairly outline the role of an advisor, or the possible sanctions being considered in Plaintiff's case.

16

117.    The Notice of Investigation also failed to provide Plaintiff information on the availability of disability accommodations for the Title IX grievance process, given that Plaintiff had College disability accommodations for his ADHD disability.

118.    Worse, Plaintiff's sole interview with Vincent was scheduled for just *hours after* the revised Notice of Investigation was issued to Plaintiff.

119.    Plaintiff attended the interview without an advisor, given the lack of information in the Notice of Investigation about the role of an advisor.

120.    Ultimately, at some point between her initial complaint and Plaintiff's interview, Roe *materially changed her March 23, 2021 allegations* from sexual intercourse to nonconsensual sexual contact.

121.    Critically, no revised Notice of Investigation was issued on the altered allegations and, in a biased and prejudicial manner, Plaintiff was interviewed based on misinformation and false allegations.

122.    At the interview, Vincent did not correct any of the gaps in the Notices of Investigation by accurately explaining to Plaintiff the role of an advisor or informing him of the possible sanctions.

123.    As a result, Plaintiff, eager to get the investigation over with, and without the guidance of an advisor, stated that he would continue on with the interview regarding both allegations.

124.    At one point during the interview, Plaintiff even stopped and asked for clarification because he was *still* not sure of what, exactly, Roe had accused him of doing.

125.    Moreover, Plaintiff indicated in his interview that he was interested in an advisor and was relying on the College to help him find one. Nonetheless, Vincent continued on with the

interview despite Plaintiff's request.

126. Without an advisor, or proper guidance on his right to have an advisor, Plaintiff was forced to navigate his sole interview uninformed as to the allegations against him and the Title IX process in general.

127. After his interview, Plaintiff furnished Vincent with Roe's emails as well as all text message communications between Plaintiff and Roe, none of which had been provided by Roe.

128. Throughout the investigation, Vincent interviewed Roe, three of Roe's friends, W3, W5, and W6, and four of Plaintiff's roommates, W1, W2, W4, and W7.

129. Throughout the investigation, and during witness interviews, the Investigators asked blatantly leading questions and made overt statements to witnesses in attempts to elicit testimony designed to find Plaintiff responsible.

130. By way of example, and not limitation, in an interview with W3, Vincent asked W3 if Plaintiff forced drinks on Roe. When W3 said that she did not know, Vincent then said "*let me rephrase it, and you tell me if I get any part of it wrong*. Okay? So, the concern would be, he's strongly encouraging, maybe forcing drinks on her so that he can, what we would say, gain sexual access to her. Does that sound right?"

131. Vincent continued to so blatantly elicit biased testimony to the point that the interviews conducted would later be rendered unusable by the Adjudicator.

132. Additionally, Roe gave numerous contradictory statements in her own interview. By way of example, and not limitation, Roe claimed that Plaintiff's engagement and her previous experiences having painful sex were her reasons why she initially did not want to have sexual intercourse with Plaintiff. However, in the same breath, Roe stated that she wanted a boyfriend and not a casual hookup, so even without those two reservations and despite her attraction to

Plaintiff, she did not want to have sexual intercourse with him.

133.    Roe initially claimed that she bled on February 4, 2021 due to her medical condition, and claimed that there was no possibility that she was menstruating because her cycle ended on January 29, 2021 and was not due again until February 25, 2021. However, Roe's medical records revealed that she indeed was due to be menstruating on February 4, 2021.

134.    Moreover, despite Roe's claims, she went to the store with Plaintiff for the purpose of buying lubricant so that she could have sexual intercourse with Plaintiff, and went on birth control in March 2021 so that they would not have to use a condom, *after* what she claimed was sexual assault on February 4, 2021.

135.    Roe also explicitly stated in her interview that *it was the actions of Plaintiff after March 23, 2021 that made her want to bring a complaint against him*, and had he not acted in the manner that he did, she would not have brought the complaints.

136.    In other words, on information and belief, had Plaintiff not broken off contact with Roe, she would not have brought a Title IX complaint against Plaintiff.

137.    Additionally, after her interview, Roe did not submit any text messages between Plaintiff and Roe, but instead claimed that she had deleted the text messages prior to the interview.

138.    Incredibly, Roe also instructed the Investigators to ignore any text messages provided by Plaintiff that might seem to inculpate her.

139.    Plaintiff obtained an advisor on July 14, 2021, well into the Title IX investigation.

140.    The Investigators issued the Preliminary Investigation Report on July 31, 2021.

141.    The Preliminary Investigation Report was incorrectly labeled as the Final Investigation Report.

142.    The Sarah Lawrence policies state that preparation and circulation of a preliminary

investigation report is not required, in violation of the Title IX regulations which require a preliminary review of all evidence by the parties with 10 days to provide a written response.

143.    Ultimately, after Plaintiff's advisor stepped in, Plaintiff was permitted to submit a response to the Preliminary Investigation Report.

144.    On August 2, 2021, Plaintiff submitted an approximately 27-page response to the Preliminary Investigation Report, which outlined numerous issues including, but not limited to:

      a.    Incorrect chronology and misidentification of the allegations and charges;

      b.    No table of contents, timeline, witness contact list, or start/end times for witness interviews;

      c.    Misrepresentation of text message evidence originally submitted by Plaintiff in chronological order such that it was impossible for the Adjudicator to clearly determine the order of the texts;

      d.    Missing evidence in the form of a written statement submitted by Witness 6;

      e.    Credibility assessment by the Investigator prior to the preliminary evidence review;

      f.    Limitations imposed on response to the preliminary report stating that responses would be reviewed to ensure that the original meaning of testimony did not change dramatically; and

      g.    Relying on misleading and biased interviews conducted by the Investigator.

145.    Following Plaintiff's response, which requested a number of follow-ups with Roe for additional information, the Investigator only contacted Roe concerning one additional piece of information.

146.    Vincent produced a Final Investigation Report on August 9, 2021.

147.    Plaintiff responded to the Final Investigation Report on August 20, 2021. Plaintiff's response outlined issues contained within the Final Investigation Report, including but not limited to:

    a.    The Investigators claimed that Plaintiff received notification that he could have an advisor in the Notice of Investigation and that he had declined, which was patently untrue;

    b.    The Investigators failed to provide dates, start and end times for each interview;

    c.    The Investigators erroneously presented Roe's February 4, 2021 allegation as her first reported complaint, and the March 23, 2021 allegation as her second reported complaint, disregarding the serious credibility concerns involved in the chronology of Roe's filed complaints;

    d.    The Investigators refused to question Roe on the dramatic theatrical play about sexual manipulation that Roe had written and produced at the time of her relationship with Plaintiff, which drew Roe's credibility into question; and

    e.    The Investigators included unfairly prejudicial and false statements made by Roe alleging that Plaintiff had sexually assaulted and/or harassed other students.

148.    Moreover, the Report failed to take into consideration Roe's motive for bringing her complaint in the first place, that is, the events that occurred after the alleged assaults and Plaintiff's ending of the relationship.

149.    Despite Plaintiff's response, no further amendments were made to the Final Investigation Report.

150.    Prior to Plaintiff's hearing, Plaintiff emailed Trujillo requesting disability accommodations, including additional time to submit an impact statement, and a designated note taker for the hearing, as he is permitted to receive in his classes.

151.    In an email dated August 25, 2021, Trujillo stated that Plaintiff would only be given one additional day to submit an impact statement.

152.    Additionally, Trujillo stated that he would be taking notes at the hearing, and did not allow Plaintiff another, impartial, designated notetaker.

153.    Plaintiff's hearing was held on August 31, 2021.

154.    Despite Trujillo's claim that he would be taking notes, Plaintiff was never provided with notes from the hearing.

155.    Moreover, despite the fact that many other colleges and universities provide real-time transcription and closed captioning during a Zoom meeting for students with disability accommodations, Sarah Lawrence did not provide the same.

156.    During the hearing, Plaintiff noticed that it appeared that the final session of the hearing was not being recorded.

157.    On August 31, immediately following Plaintiff's hearing, Plaintiff emailed his opening and closing statements to Trujillo to be provided directly to the Adjudicator so that she would have the statements for reference when making her determination, given the lack of recording.

158.    The Adjudicator, Deborah David, Esq. ("David"), issued her decision on September 8, 2021 (the "Decision Letter").

159.    The Decision Letter found Plaintiff responsible for nonconsensual sexual intercourse on February 4, 2021, and not responsible for nonconsensual sexual intercourse and nonconsensual sexual contact for the March 23, 2021 incident.

160.    Plaintiff was sanctioned to suspension from the College for a minimum of one year, a permanent no-contact order, and a ban from campus housing until Roe graduates (the "Sanction").

161.    Notably, however, David recognized that the Notices of Investigation did not comply with the College's policies.

162.    Specifically, David noted that the May 3, 2021 Notice of Investigation (i) failed to set out the specific policy violations that were alleged to have been violated; (ii) failed to include

information about possible sanctions; (iii) acknowledged that Plaintiff asked the College to provide him with an advisor, and that the College incorrectly stated that an advisor can only provide emotional support but not actively participate in the investigation; (iv) stated that the notice concerning the March 23, 2021 encounter incorrectly stated that the allegations involved penetration; and (v) Plaintiff was never sent a corrected Notice of Investigation that limited the March 23, 2021 allegations to nonconsensual kissing, touching, and fondling.

163.     Additionally, David determined that *Plaintiff's sole interview was so significantly flawed by the Investigators that it was not relied upon in its entirety in her decision*.

164.     Given that Plaintiff did not have an advisor present, David stated that she would not rely on Plaintiff's interview to draw any negative inferences or conclusions against him.

165.     David also determined that the Final Investigation Report was so defective that she could not consider it in her decision, noting that Vincent put words in the mouths of witnesses in his interviews throughout the investigation.

166.     As a result, David was only able to rely on the material in the investigation evidence file and the hearing.

167.     However, the evidence file and the hearing record were both incomplete. By way of example, and not limitation: (i) The College did not collect all messages between Roe and Plaintiff because Roe claimed that she had deleted them; (ii) the Investigators made no effort to collect evidence from witnesses that could inculpate or discredit Roe; (iii) the hearing record was not a full transcription of the hearing; and (iv) on information and belief, the final session of the hearing was not included in the recording.

168.     David, however, as well as the Investigators, gave no consideration to Roe's actions before, during, and after her complaints that were wholly inconsistent with her claims, such as the

fact that Roe chased after Plaintiff by sending him texts explicitly soliciting sexual intercourse and told Plaintiff that she liked him even after the alleged sexual assaults occurred, and that Roe did not file her complaint until after Plaintiff cut off contact with her.

169.    Despite the ADA accommodations agreed upon, Trujillo did not email Plaintiff with a hearing summary until September 14, 2021.

170.    Moreover, the "hearing summary" sent by Trujillo to Plaintiff was not an adequate transcription of the hearing, lacking full timestamps and at least one specific outburst by the complainant.

171.    Given that David issued her decision on September 8, 2021, on information and belief, David did not have a complete hearing recording and transcription before rendering her decision.

172.    Plaintiff timely submitted his appeal on September 25, 2021, given that he did not have the partial hearing recording and transcription to review until September 14, 2021.

173.    Plaintiff's appeal outlined the numerous procedural errors throughout the investigation process that had a material and prejudicial effect on the outcome of the investigation.

174.    Before the Appeal had been decided, Roe continued her smear campaign against Plaintiff by posting on the Instagram account @slcanonymous, stating that he had been found guilty of sexual assault and falsely claiming that Roe was one of seven students that complained to the Title IX office about Plaintiff.

175.    The @slcanonymous Instagram account is followed by a number of official Sarah Lawrence Instagram accounts such as the College's theatre page (@slctheatreofficial) and the College's library page (@slclibrary), which have been created by, and with the approval and management of, school faculty and staff.

176.     Moreover, during the investigation, Roe posted a picture on her Instagram page of Roe pointing a gun at a young boy's head.

177.     On information and belief, this post was made to intimidate Plaintiff.

178.     Plaintiff brought Roe's social media postings to Trujillo's attention on November 4, 2021, however, the College failed to take any action, and only further enabled Roe's egregious behavior.

179.     On information and belief, the College failed to take action against Roe despite her threatening and false social media postings because Roe is a female accuser.

180.     On December 8, 2021, the Appeal Panel denied Plaintiff's appeal.

181.     Plaintiff has exhausted all available avenues for appeal under Sarah Lawrence's policies. This lawsuit represents Plaintiff's only hope to redress the wrongs occasioned by Defendant.

182.     By supporting Roe's claims despite her lack of evidence and serious credibility issues, the College has encouraged and enabled Roe to continue her campaign of following and harassing Plaintiff while smearing his character.

### III.     AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT SARAH LAWRENCE

183.     Upon Plaintiff's matriculation to Sarah Lawrence, Plaintiff and Sarah Lawrence became mutually bound by the Student Handbook (the "Handbook"), containing the Sarah Lawrence College Policy on Sexual Violence and Procedures for Complaints Against Students Regarding Sexual Violence (the "Policy"), which is the applicable policy for Sarah Lawrence's Title IX procedures.

184.     On information and belief, the Handbook is updated and/or revised each new school year.

185.    The Handbook and/or the various provisions contained therein are available online through the Sarah Lawrence website.

186.    In response to local and federal pressure for failing to protect female accusers or taking a strong enough stance against sexual assault allegedly committed by males, Sarah Lawrence applied the Policy in a manner that, on information and belief, resulted in harsher penalties for males accused of sexual misconduct as compared to females.[4]

187.    The Policy contains and represents a contract between students and the College and, in particular, between Plaintiff John Doe and Defendant Sarah Lawrence.

188.    Throughout the Title IX process in this case, Defendant breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the processes set forth therein, and by permitting gender bias to infect and taint the proceedings, resulting in an erroneous outcome.

189.    The Policy states that the respondent is to "[b]e provided with the Notice of Complaint, with details including the date, time, location, and alleged Policy violations to be investigated under these Procedures."

190.    The College breached the Policy by failing to give Plaintiff proper notice of the allegations against him. Indeed, the College failed to provide sufficient details of the allegations and the policy provisions implicated, including mischaracterizing the March 23, 2021 allegation as one involving sexual penetration, and also failed to provide information regarding the possible sanctions.

---

[4] Sarah Lawrence has not published statistics concerning the outcomes of sexual misconduct proceedings, including the gender of respondents who were sanctioned as a result thereof. This is information that Plaintiff intends to seek in discovery.

191.    The Policy states that respondents have the right to "[b]e informed, in cases where… A meeting with the Respondent is otherwise deemed appropriate, of the approximate date and time, location, and nature of the alleged Policy violation that has been reported to the Title IX Office."

192.    The College breached the Policy by failing to provide Plaintiff with sufficient details of the alleged conduct and policy provisions violated when he was notified of Roe's February 4, 2021 allegations just hours before his meeting with the Investigators.

193.    According to the Policy, respondents have the right to "[p]articipate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard."

194.    The College breached the Policy by failing to provide Plaintiff with a meaningful opportunity to be heard, as his sole interview was done without an advisor and without proper notice of the allegations against him.

195.    The Policy states that students have the right to "[b]e accompanied by an advisor of choice who may assist and advise the Parties throughout the judicial or conduct process, including during all meetings and hearings related to such process."

196.    The College breached the Policy by failing to properly inform Plaintiff of his right to have the advisor of his choice present, and incorrectly stating that Plaintiff's advisor could only serve as emotional support and not participate in the conduct process.

197.    According to the Policy, "[b]oth the Complainant and Respondent will be given of seven (7) calendar days from the Notice of Complaint to supply… a written statement [if any], the witness list, physical evidence [if any], and the Advisor Form… to the Deputy Title IX Coordinator… Upon receipt of the above materials, the Deputy Title IX Coordinator will coordinate with all Parties… to schedule an interview with the Investigator(s)."

198.    The College breached the Policy by failing to give Plaintiff seven calendar days to submit materials, including obtaining an advisor and submitting his Advisor Form, prior to scheduling an interview. Instead, Plaintiff had his interview just hours after receiving the revised Notice of Investigation that contained entirely new allegations.

199.    The Policy states that the Appeals Panel will use "the recording of the hearing" in making an appeal determination.

200.    The College breached the Policy because, on information and belief, the end of the hearing was not recorded.

## IV.    N.Y. EDUCATION LAW ARTICLE 129-B

201.    On July 7, 2015, the New York State Governor signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015. *See* N.Y. Educ. L. § 6438 *et seq*.

202.    Art. 129-B applies to "any college or university chartered by the regents or incorporated by special act of the legislature that maintains a campus in New York," including Sarah Lawrence. *See* N.Y. Educ. Law 6439(1). It mandates that all such institutions, including Sarah Lawrence, adopt certain rules and procedures in connection with their sexual misconduct policies.

203.    Art. 129-B mandates that each institution file with the State a certificate of compliance with the law, as well as a copy of all written rules and policies adopted in accordance with the statute. If any institution fails to file a certificate of compliance, it will be ineligible to receive state aid or assistance until such time as it files the certificate. Art. 129-B also requires the State to conduct random audits to ensure compliance with the provisions of the statute.

204.    Art. 129-B sets forth a standard of care with which colleges, including Sarah

Lawrence, and their agents and representatives, must comply when addressing complaints of sexual assault and disciplinary proceedings related thereto.

205.    In the instant case, Sarah Lawrence and its agents and employees breached their duty of care to Plaintiff as an enrolled student subject to disciplinary proceedings governed by Art. 129-B. As a result of this breach, Plaintiff suffered damages including loss of future educational and career opportunities.

206.    Art. 129-B mandates that all New York State institutions of higher education, including Sarah Lawrence, "shall ensure" that every student be afforded the following rights:

  a. The right "to have the complaint investigated and adjudicated in an impartial, timely, and thorough manner by individuals who receive annual training in conducting investigations of sexual violence, the effects of trauma, impartiality, the rights of the respondent, including the right to a presumption that the respondent is 'not responsible' until a finding of responsibility is made pursuant to the provisions of this article and the institution's policies and procedures";

  b. The right "to an investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest";

  c. "Access to at least one level of appeal of a determination before a panel, which may include one or more students, that is fair and impartial and does not include individuals with a conflict of interest"; and

  d. The right "to make an impact statement during the point of the proceeding where the decision maker is deliberating on appropriate sanctions."

*See* N.Y. Educ. L. § 6444.

207.    Defendants violated these rights, as guaranteed by Article 129-B, by: (i) failing to conduct a thorough and impartial investigation into Roe's claims against Plaintiff, given that the Investigators carried out biased interviews which proposed leading questions and put words in witnesses' mouths in order to paint Plaintiff as responsible; (ii) failing to afford Plaintiff the presumption of innocence; (iii) failing to provide Plaintiff with proper notice; and (iv) failing to

provide Plaintiff with a meaningful opportunity to respond.

## V.     **PLAINTIFF'S DAMAGES**

208.    As a direct and proximate result of Defendant's biased, illegal, and improper conduct, an erroneous finding that Plaintiff engaged in nonconsensual sexual intercourse has been made a part of Plaintiff's educational records and a notation has been made on his records and transcript. These records may be released to educational institutions and employers to whom Plaintiff applies, substantially limiting his ability to gain acceptance to a graduate school or to secure future employment. Roe's allegations painted Plaintiff as a dangerous sex criminal, wiping out a lifetime of hard work towards his college education and future career prospects.

209.    By improperly suspending Plaintiff and placing a notation on his transcript, Sarah Lawrence has damaged Plaintiff's future education and career prospects. Specifically, as a result of the College's actions, Plaintiff will be forced to disclose and explain to potential employers and any school to which he may opt to apply that he was disciplined by Sarah Lawrence for sexual misconduct.

210.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future education and career prospects.

211.    Roe engaged in a campaign of retaliation against Plaintiff that Defendant allowed to go unchecked. Roe posted false allegations concerning Plaintiff to the Instagram page @slcanonymous ("Sarah Lawrence College Anonymous"), again harming Plaintiff's reputation.

212.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

213.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff has been falsely

labeled as a perpetrator of sexual misconduct.

214.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, and the Sanction is listed on Plaintiff's transcript.

215.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his future educational and career prospects.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972**
**Erroneous Outcome**

216.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

217.    Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

218.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Sarah Lawrence.

219.    On information and belief, Sarah Lawrence receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

220.    Title IX is enforceable through a private right of action.

221.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action

which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b); 28 C.F.R. § 54.135(b).

222.    Title IX may be violated by a school's imposition of college discipline where gender is a motivating factor in the decision to discipline.

223.    Sarah Lawrence engaged in gender bias in its Title IX proceedings. Plaintiff was innocent and wrongly found to have committed a violation of the College's policies, and gender bias was a motivating factor.

224.    Sarah Lawrence failed to conduct an adequate, reliable, and impartial investigation of Roe's complaint based upon, by way of example and not limitation:

      a.      Failing to provide Plaintiff with proper notice of the allegations against him;

      b.      Failing to provide Plaintiff with the possible sanctions to be imposed;

      c.      Failing to provide Plaintiff with proper notice of his right to an advisor;

      d.      Interviewing Plaintiff hours after receiving the revised Notice of Investigation, without an advisor;

      e.      Asking leading questions to the witnesses to twist the narrative and have Plaintiff found responsible;

      f.      Failing to ask Roe questions that would negatively impact her credibility, such as those pertaining to the chronology of her complaints or her motive for bringing the complaints;

      g.      Failing to provide Plaintiff with notes at the hearing; and

      h.      Failing to properly apply the preponderance of the evidence standard given the lack of evidence in the case and Roe's conflicting statements.

225.    Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous finding and the decision to impose unduly harsh discipline upon Plaintiff. These circumstances include, by way of example and not limitation:

a.    The pressure imposed by the 2018 OCR resolution issued to address lack of Title IX compliance by Sarah Lawrence, including the fear of loss of federal funds as well as the fear of added financial liability such as reimbursing tuition for aggrieved students if the College was not compliant;

b.    Internal pressure from the student body and media to aggressively pursue complaints of sexual misconduct against males and to believe all women in cases of sexual assault regardless of the evidence;

c.    Providing inequitable Notices of Investigation to the parties, lacking critical information in the notice sent to Plaintiff, which was provided in the notice sent to Roe;

d.    Conducting blatantly biased interviews, and feeding leading questions to the female witnesses while refusing to seek out information that could be exculpatory for Plaintiff;

e.    Defendant's distortion of the evidence and of Plaintiff's statements to fit Roe's narrative, rather than impartially evaluating the facts of the case; and

f.    Defendant's refusal to apply the particular facts of the case in considering the appropriate sanction, including the fact that Roe was about to be studying abroad and thus Plaintiff posed no threat to her on campus.

226.    On information and belief, Sarah Lawrence's mishandling of the complaint was informed by institutional pressure, ongoing OCR investigations into noncompliant colleges and universities, and the threat of rescission of federal funds.

227.    On information and belief, Sarah Lawrence has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against non-male students.

228.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

229.    This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to, loss of future educational and

career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

230.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Sarah Lawrence to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original finding and sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

### AS AND FOR A SECOND CAUSE OF ACTION
**Violation of 42 U.S.C § 12132 - Americans with Disability Act**

231.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

232.    42 U.S.C § 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of public entity or be subjected to discrimination by any such entity."

233.    Plaintiff is a "qualified individual with a disability," and Defendant Sarah Lawrence is a "public entity" as defined in 42 U.S.C. § 12131(1) and is subject to the mandate of the Americans with Disabilities Act (hereinafter "ADA").

234.    Defendant Sarah Lawrence, by refusing to provide Plaintiff with disability accommodations during his Title IX hearing including a designated note taker and transcription during the hearing prejudiced Plaintiff and his ability to participate meaningfully in the Title IX process.

235.    As a result, Plaintiff was denied the opportunity to participate and respond meaningfully due to his disability.

34

236. Even after the hearing, Plaintiff was not provided with Trujillo's notes, or a full transcription of the hearing, but rather was only provided with a "hearing summary" that missed significant portions of the hearing.

237. Accordingly, by denying Plaintiff's disability accommodations, and prejudicing Plaintiff in the Title IX process, ultimately leading to his suspension from the College, Defendant Sarah Lawrence is in violation of the ADA.

238. As a direct and proximate consequence of the Defendant's conduct, Plaintiff suffered damages, including without limitation violations of his constitutional rights, compensatory damages and emotional trauma.

<u>**AS AND FOR A THIRD CAUSE OF ACTION**</u>
**Breach of Contract**

239. Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

240. At all times relevant hereto, a contractual relationship existed between Plaintiff and Sarah Lawrence through Sarah Lawrence's dissemination of the policies and procedures governing the student disciplinary system, including but not limited to the Policy, and Plaintiff's tuition payments and other consideration, such as compliance with the College's relevant policies.

241. Sarah Lawrence committed numerous breaches of its agreements with Plaintiff during the investigation and adjudication of Jane Roe's allegations against him, including but not limited to:

    a.    Failing to provide proper notice of the allegations with sufficient detail, including the relevant policy provisions;

    b.    Failing to provide Plaintiff with a meaningful opportunity to be heard, as his interview was scheduled for just hours after he received the revised Notice of Investigation;

  c.  Failing to provide Plaintiff with proper information regarding his right to the advisor of his choice;

  d.  Failing to give Plaintiff seven calendar days from the revised Notice of Investigation to schedule an interview and secure an advisor; and

  e.  Failing to record the hearing in its entirety.

242. Further, included in these contractual agreements is the covenant of good faith and fair dealing implied in all contracts. *Ccr Int'l v. Elias Grp.*, 2021 U.S. Dist. LEXIS 68169, at *13 (S.D.N.Y. Apr. 5, 2021).

243. The implied covenant of good faith and fair dealing "includes promises that a 'reasonable person in the position of the promisee would be justified in understanding were included' in the contract and, when the contract involves the exercise of discretion, a promise 'not to act arbitrarily or irrationally in exercising that discretion.'" *Id.* (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 639 N.Y.S.2d 977 (1995)).

244. Sarah Lawrence breached the covenant of good faith and fair dealing implied in the Policy. Examples of such breach include, but are not limited to:

  a.  The Investigators abused their discretion by asking leading questions to witnesses in order to paint a narrative that led Plaintiff to be found responsible;

  b.  The Investigators failed to properly inform Plaintiff of all relevant procedural information, such as the role of his advisor;

  c.  The Title IX Coordinator failed to provide Plaintiff the agreed-upon ADA accommodations, such as providing his hearing notes to Plaintiff; and

  d.  The Adjudicator abused her discretion by implementing an unduly harsh sanction that did not consider the specific facts of the case.

245. As a proximate and foreseeable consequence of the foregoing, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic

injuries and other direct and consequential damages.

246.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus

punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against

Defendant as follows:

(i)     On the first cause of action for Violation of Title IX of the Education Amendments of 1972 Erroneous Outcome, a judgment against Sarah Lawrence awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Sarah Lawrence to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(ii)    On the second cause of action for violation of 42 U.S.C § 12132 (Americans with Disability Act), a judgment against Defendant Sarah Lawrence, awarding Plaintiff compensatory damages in an amount to be determined at trial, in addition to damages to physical well-being, emotional and psychological damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    On the third cause of action for Breach of Contract, a judgment against Sarah Lawrence awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    Equitable relief in the form of an order directing Defendant to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(v)     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated:   **New York, New York**
         **July 11, 2022**

**Respectfully submitted,**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff John Doe*

**By: /s/Andrew T. Miltenberg**
 **Andrew T. Miltenberg, Esq.**
 **Stuart Bernstein, Esq.**
 **363 Seventh Avenue, Fifth Floor**
 **New York, New York 10001**
 **212-736-4500**
 **amiltenberg@nmllplaw.com**
 **sbernstein@nmllplaw.com**
